69 So.2d 685

UNITED STATES STEEL CO.

v.

BUTLER.

6 Div. 461.

Supreme Court of Alabama.

Oct. 29, 1953.

Rehearing Denied Jan. 14, 1954.

Burr, McKamy, Moore & Tate and Jas.
R. Forman Jr., Birmingham, for appellant.

192

Bryan Chancey, Birmingham, for appellee.

SIMPSON, Justice.

This is an action of trespass on the case by appellee suing as personal representative of Captain Butler, deceased, under the homicide statute, against appellant for wrongfully causing the death of her intestate. The deceased was shot and killed by two employees of appellant.

Right to a reversal is rested on two propositions: First, that the defendant was entitled to a directed verdict or the affirmative charge; and second, the verdict was against the weight of the evidence. We entertain the view that neither position is well taken and that the challenged rulings of the trial court must be sustained.

Two primary questions are to be determined: (1) whether the acts complained of were within the line and scope of the employment of the defendant's agents or servants who killed the deceased; and (2) the issue of self-defense of these two employees. We will, therefore, first state the tendencies of the evidence. The incident occurred on the property of the defendant company in what is known as Edgewater Village. The defendant was engaged in coal mining operations at that place and in connection therewith maintained the village consisting of some five hundred dwelling houses, where its employees resided, and other buildings such as a commissary, etc. The deceased, Butler, resided in this village, was fifty-three years of age, and had been an employee of defendant for about twenty-five years. The two employees who killed him were one J. A. Vanderford, whose official title was village deputy, and Paul B. Thomas, whose official title was mine deputy. Vanderford's duties were in connection with keeping the peace and order of the village and keeping the houses rented, and Thomas' duties were with respect to the operation of the mining department as distinguished from the houses and the village. On June 4, 1948, Butler was said to have "flipped" a note over the hedge of one of the white residences, the contents of which are as follows:

"You are so charming with added intelligence that I believe you can be trusted and yet if you dont prefer dont be mad with me but I would like to see you. If I can answer this note and place it at the north corner of your Garage and I will get it in the morning if you can get out alone state time and place and give me time we will work out something that wont leak.

"A friend"

The residence was occupied by an employee, John Riddle, and his family and his fifteen-year-old daughter, Mitzi Riddle, being in the back room adjacent to the hedge and seeing whom she later that day identified as Butler throw the note over the hedge,

went out and got it and took it to her mother. Her mother then contacted the village deputy, Vanderford, and reported the incident to him. Vanderford contacted C. R. Davis, superintendent of the plant protection department of the defendant company, who was the superior officer of Vanderford and Thomas, and reported the incident to him. It seems that Vanderford and Thomas also had commissions as special deputy sheriffs of Jefferson County in order to more efficiently carry out their duties as deputies of the appellant, but they received no compensation from the sheriff's office, their entire compensation being paid by the defendant. When the matter was reported to Mr. Davis he instructed Vanderford to go to the sheriff's office in Bessemer and have an investigation made of the incident. Vanderford did this and the next morning two deputies from the sheriff's office in Bessemer picked up Vanderford in their automobile and then got Thomas and these four officers concealed themselves in the Riddles' garage; meanwhile Miss Mitzi Riddle had placed a blank envelope under the corner of the garage, purportedly so as to appear as a response to the suggestion in the note, and a little later that day, according to the testimony of Vanderford and Thomas, Butler came by and picked up the note as he walked through the alley by the garage; Vanderford then moved out and told him he wanted to talk to him and according to Vanderford, Butler attempted to draw a gun from his shirt bosom, whereupon Vanderford drew his pistol and shot Butler twice and Thomas, immediately to the rear of Vanderford, stepped out at about the same time and fired two shots in the body of Butler also. The two regular deputies from the sheriff's office appear to have done nothing and did not testify in the case. These two company deputies testified that Butler did have a pistol and that it was by his side when he fell and that the coroner took charge of it. One strange aspect of the case is that neither of the two regular deputy sheriffs who were at the garage with these two company deputies testified to corroborate the testimony of Vanderford and Thomas, nor did the coroner testify to corroborate the fact of Butler having had a

pistol or the wounds on the deceased's body. The only testimony in the case as to the location of the wounds showed he was shot in the back.

Of course, to recover against the defendant upon the theory of *respondeat superior*, it was necessary for the plaintiff to establish the status of master and servant and that the act done was within the scope of the servant's employment. The relation of master and servant is conceded. The grave question to be determined is whether Vanderford and Thomas, one or both, were acting within the line and scope of their employment when they killed the deceased. The rule has many times been stated in our cases in varying language. Boiled down it is: To authorize the submission of the question to the jury, the evidence must have a tendency either directly or by reasonable inference to show that the wrong was committed by the agent while he was executing his agency, that is, undertaking to execute the duties assigned to him and not from a motive or purpose of his own having no relation to the business of the master. If the evidence tends to establish that the act was an incident to carrying out the duties assigned to him by his master, the master may be held liable though he did not authorize the agent to resort to such means in rendering the services for which he was employed and also though the agent may have sought to accomplish the master's business by improper or unlawful means or in a way unknown to his master or even contrary to his express directions. The legal aspect of such a case is not changed because the agent superadds malice or other improper motive to his otherwise wrongful act. The following authorities, among many others which could be cited, sustain the proposition: Hardeman v. Williams, 169 Ala. 50, 53 So. 794; Republic Iron & Steel Co. v. Self, 192 Ala. 403, 68 So. 328, L.R.A. 1915F, 516; Shope v. Alabama Fuel & Iron Co., 195 Ala. 312, 70 So. 279.

As stated, Vanderford was employed to maintain the peace and order of the village and Thomas apparently was assigned the same duties with respect to the mining property. We will particularize the evidence with respect to Vanderford's

duties, since it appears he took charge of the investigation. In his responsibility for maintaining the peace and order of the village, the testimony was that he acted as law enforcement officer therein; it was his duty to protect the property and the people in it and try to keep down trouble; he (as well as Thomas) had no regular hours of employment, but was subject to call at all times, day or night; and any time anyone should make a complaint "about anything being wrong" the complaint was made to Vanderford and he "answered these complaints as village deputy for the appellant." In other words, he "policed" the village. These two deputies were the only law enforcement officers maintained by the company at that place. This evidence was sufficient to make it a jury question as to whether or not at the time he killed deceased Vanderford was acting in furtherance of the duties assigned to him, and the same applies to Thomas. The mere fact that they were also special deputies under appointment of the sheriff of Jefferson County did not materially alter their status as the servants or agents of the defendant. This additional circumstance simply raised a question as to the capacity in which they acted. Vanderford undoubtedly was acting in the execution of his duties as village deputy, since from aught appearing from the evidence he was in charge of the party, laid the plans to entrap the deceased before he visited the sheriff's office in Bessemer, and then having entrapped him proceeded to carry out his mission to interrogate him and finally shot him down. We find nothing in the record to disclose what if an·-+hing the officers of the law of Jefferson County did in connection with the matter, or that this so-called "investigation" was being carried out for the sheriff's office of Jefferson County. Clearly from this evidence the jury could reasonably infer that the incident grew out of the effort of Vanderford and his colleague, Thomas, to carry out the instructions of the defendant to protect the property and people of the village, keep down trouble and answer their complaints, and that their conduct on that occasion was an incident to carrying out those duties and was not from a personal motive or purpose having no relation to the master's business.

The request for a directed verdict and the affirmative charge was therefore properly refused. The following cases bear some analogy and are sustentive: Shope v. Alabama Fuel & Iron Co., supra; Hardeman v. Williams, supra; Scipio v. Pioneer Mining & Mfg. Co., 166 Ala. 666, 52 So. 43; Case v. Hulsebush, 122 Ala. 212, 26 So. 155; Mt. Vernon Woodberry Mills v. Little, 222 Ala. 605, 133 So. 710; Caudle v. Sears, Roebuck & Co., 236 Ala. 37, 182 So. 461.

The other propositions advanced as error to reverse are to be determined from a consideration of the issue of self-defense. It is argued that defendant was entitled to a directed verdict or the affirmative charge on this special plea or if not that the great preponderance of the evidence sustained the plea to the result that error prevailed in the ruling of the trial court in denying the motion for new trial on that ground. Here also, however, we find ourselves in disagreement with learned counsel who have so cogently argued the point. True, the interpretation appellant would accord the evidence might lead to the result contended for, but there were sufficient adverse inferences which presented serious conflicts on the issue of the self-defense of Vanderford and Thomas and it was within the province of the jury to resolve the conflicts against the defendant, as it did do.

The allegations of the plea of self-defense, in essence, are: (1) that at the time of the fatal shooting the deceased was making a violent assault with a pistol upon defendant's agents or servants, which assault placed said servants or agents in imminent danger, real or apparent, of their lives or serious bodily harm; (2) that said agents or servants had no reasonable means of escape without increasing their peril; and (3) that said agents or servants were free from fault in bringing on the difficulty.

The pertinent rule is that obtaining in felonious criminal cases. The burden of proof is on the defendant to prove that its agent or servant was in impending peril, that there was no reasonable avenue of retreat; and these two elements being established, the burden would then shift to the plaintiff to show that the agent or servant was at fault in bringing on the difficulty.

Mt. Vernon Woodberry Mills v. Little, supra; Morris v. McClellan, 154 Ala. 639, 45 So. 641, 16 Ann.Cas. 305.

We think it is made manifest from the evidence that on these issues there was grave conflict and warranted submission to the jury the plea of self-defense. Let us analyze the evidence with respect to the plea. Of course, if any element of the plea is not sustained by the evidence, the whole plea fails. We think, however, the jury could have inferred that defendant had failed to establish either of the elements. With respect to allegation (1) that the deceased was making a violent assault with a pistol on the defendant's agents, thereby placing them in imminent danger, real or apparent, it was open to the jury to conclude that the deceased was killed under just exactly the opposite circumstances. He was at a place he had a right to be, in a public alley, in his work clothes on his way to work, whereupon he was accosted by Vanderford who, when deceased, according to Vanderford, made a demonstration toward his shirt bosom, shot him down. But the deceased was shot in the back, or at least there was no evidence to the contrary. No one claimed to have seen the pistol except these two company deputies who did the shooting. There was testimony that deceased owned no such pistol as these deputies described and the pistol claimed to have been on him and taken charge of by the coroner was never presented in evidence or identified by anyone except these defendant's employees. Under this state of the evidence the jury might well have thought that it should have had the benefit of the testimony of the two regular deputy sheriffs, who were at the scene, as well as the coroner to also substantiate this allegation of the plea; and if the deceased was not shot in the back, as the son testified he was, it would have also been an easy matter to have proved it by the coroner. So with the evidence as it was, there was warrant for the jury's conclusion that at least the first element of self-defense was not proven and that the deceased was not making a violent assault, attended with real or apparent danger, on these two company deputies. The law of self-defense is ruled by what a reasonably prudent person would have done under like circumstances and not only must the actor who pleads it show by the evidence that he entertained an honest belief of the existence of the necessity, real or apparent, to act as he did, but that the circumstances surrounding him at the time were such as would have impressed a reasonable man, so circumstanced, that he was in imminent peril of life or limb. Kuykendall v. Edmondson, 208 Ala. 553, 94 So. 546; Drummond v. Drummond, 212 Ala. 242, 102 So. 112. And the same argument goes for the second element, namely, that the company officers had no reasonable avenue of retreat.

With respect to the final element of self-defense, that is, freedom from fault, we think the evidence affords some inference that these deputies were not free from fault in bringing on the difficulty. They had no warrant of arrest for deceased and, according to the evidence for appellant, they were not on the premises for the purpose of apprehending Butler, but were merely there for the purpose of identifying him as the person who the day before had flipped the note over the hedge. But Butler had already been identified. Miss Mitzi had pointed him out to Vanderford the day before as the one. The jury could have inferred that deceased was doing nothing to bring on the occurrence, had a right to be where he was, and had nothing to do with the four armed deputies being hidden in the garage when these two agents or servants of defendant came from the garage and advanced on him. Therefore if these circumstances were to be believed by the jury, it could have inferred that he was at no fault in bringing on the trouble. We do not say such was the case, only that such an inference was open to the jury to accept.

From these considerations, it is also made manifest that we should not declare error in the refusal of the trial court to grant the new trial on the weight of the evidence. This court's reluctance to disturb the verdict of the jury based on reasonable inferences arising from the evidence in a case fairly tried, when its presumed correctness has been strengthened by the lower court's approval of it, is traditional. We have said the genius of our system is to commit to this impartial body of men the discretion of resolving the various conflicts in the evidence.

Osborn v. Grizzard, 251 Ala. 275, 37 So.2d 201. It is a good system. We should maintain it.

This case is typical to illustrate the principle. Concededly the questions for decision were close ones and not free of difficulty and though the decision of the reviewing court might have been different, there still would be no warrant in reversing the trial court in denying the motion, since it is not made at all certain that the verdict was so against the great weight of the evidence as to clearly convince us that it was wrong and unjust. Southern R. Co. v. Smith, 221 Ala. 273, 128 So. 228; Huckaba v. Hill, 209 Ala. 466, 96 So. 569; Winter v. Judkins, 106 Ala. 259, 17 So. 627; Cobb v. Malone. 92 Ala. 630, 9 So. 738.

Affirmed.

LIVINGSTON, C. J., and GOODWYN and CLAYTON, JJ., concur.

On Rehearing

PER CURIAM.

This court on original deliverance had painstakingly studied and discussed this case in consultation in connection with the applicable authorities so cogently pressed on us by counsel for appellant. We were convinced then and still are that to reverse the judgment would have been entirely without warrant. We do, however, wish to make this brief response in deference to counsel's argument on rehearing.

It is asseverated that by the court's opinion counsel "has been taken to task" for failure to introduce certain witnesses and evidence. Suffice to say such was not the intent of the opinion, for the case was well tried.

 It is argued that the court should not have mentioned as a circumstance against the defendant the fact that the two deputy sheriffs in the party of officers who were hidden in the garage were not produced as witnesses to corroborate the testimony of Vanderford and Thomas. The general principle, of course, is that no unfavorable inference may be drawn because of the absence of testimony where the absent witness is shown to have been equally accessible to both parties or that the testimony would have been cumulative. Coosa Portland Cement Co. v. Crankfield, 202 Ala. 369, 80 So. 451. The rule, however, is subject to some refinements. A party may not be expected to produce a witness likely to be unfavorable to him and if the other party has a witness possessing peculiar knowledge of the transaction and will probably be favorable to him and fails to produce such witness when he has the means of doing so, this in the absence of explanation is ground for suspicion that such better testimony would make against him. Carter v. Chambers, 79 Ala. 223; Alabama Power Co. v. Talmadge, 207 Ala. 86, 93 So. 548. Under this latter principle, therefore, we think our statement regarding the absence of corroboratory testimony of that of the two company deputies to have been justified.

We are "taken to task" with respect to our view of certain of the evidence, and perhaps rightly so in stating that the deceased lived in the Edgewater Village, whereas he lived in the adjoining community of "Capstown," but such slight inadvertence could in no sense change the conclusion. And the same observation goes with respect to other criticisms of our interpretation of the evidence, including our statement that Vanderford was instructed to make an investigation and was in charge of same. The evidence is open to this inference, since it discloses that his superior officer, Davis, "instructed Vanderford to go to the Sheriff's Office in Bessemer and have an investigation made of the incident." Vanderford had already investigated, and notwithstanding the fact that the sheriff's deputies did arrange to pick up the two company deputies that morning to make the investigation, if Vanderford were not in charge of the party he certainly took charge at the scene of the tragedy. We think counsel is in grievous error in urging us to conclude as a matter of law that Vanderford and Thomas were acting under direction of the sheriff's office rather than that a substantial jury question was presented as to whether they were acting in line and scope of their own employment as company deputies.

Learned counsel for appellant also directs our attention to the following state-

ment in the opinion: "But the deceased was shot in the back, or at least there was no evidence to the contrary." Although there was evidence from which the *inference* might be drawn that the deceased was not shot in the back (i. e., the statement in the death certificate that the immediate cause of death of the deceased was gunshot wounds of the chest, arm, and shoulder—although this would not necessarily mean the bullets entered from the front—and the testimony of the two deputies to the effect that deceased was shot as he was advancing towards them) and possibly a more correct appraisal of the testimony would be, there was no direct and positive evidence to the contrary rather than "there was no evidence to the contrary," this does not change the conclusion, viz., there was from all the evidence in the case warrant for the jury's conclusion that the deceased was not making a violent assault on the two company deputies.

We are constrained to adhere to the original conclusion.

Application for rehearing overruled.

LIVINGSTON, C. J., and SIMPSON, GOODWYN and CLAYTON, JJ., concur.